MICHAEL J. HUGHES and Others, Plaintiffs, *v.* CITY OF BUFFALO and Another, Defendants.

Supreme Court, Erie County, August 6, 1929.

*Feldman & Feldman* [*Charles L. Feldman* and *George J. Feldman* of counsel], for the plaintiffs.

*Gregory U. Harmon, Corporation Counsel* [*James A. Deckop* of counsel], for the defendants.

NOONAN, J. This is an action for the specific performance of an alleged contract between the plaintiffs and defendants. There is little, if any, conflict of evidence and part of the law applicable to the case is conceded by both parties.

In 1927 the board of education of the city of Buffalo wished to acquire a tract of land for a school building in a section of the city bounded by Main street, the Delaware, Lackawanna and Western railroad and Kenmore avenue, the north line of the city. On June 6, 1927, the so-called Mildred street site was submitted to the board. It consisted of fourteen building lots, one of which, a triangular lot of about 3,890 square feet at the southeast corner of Merrimac and Mildred streets, was then owned by the city, and the remaining lots were owned by the plaintiffs as follows: Jessie F. Clarke, two lots; Alexander J. Ross, four lots; John Mahoney and wife, one lot; George Urban, Jr., one lot; John Monkelban and wife, one lot; Ida M. Chant, two lots; Anna G. Impallaria, one lot; and William M. Farrell was supposed to own one lot.

Prior to submitting this site, the plaintiff Hughes, assisted by Ferderick J. Ross, had secured valid options to purchase eleven of the lots from their respective owners, and one option of questionable validity for the purchase of the Farrell lot. He had no option on the lot owned by George Urban, Jr. On said date this tract of land was offered to the board of education by Mr. Ross in a letter which said: " * * * we are submitting this matter to you in two parcels. The smaller sight [*sic*] is 66,000 square feet * * * the price is $69,525.00 and is assessed for $30,990.00. There is located on this sight [*sic*] three good houses that can be sold at a good price * * *." Some map or sketch of the tract was submitted with the letter but it is not certain which one it was, and other maps and sketches were furnished later.

The board of education considered the offer, and finally, on December 20, 1927, recommended the site to the city council. This recommendation was referred to the finance commissioner for his action. He reported favorably on December 28, 1927, and the resolution to purchase the property was acted upon December 31, 1927, and passed by a vote of three to two. On January 1, 1928, the form of government of the city was changed to the present charter and on January 5, 1928, the new city council unanimously rescinded the action of the old council that was taken on December

31, 1927. The mayor vetoed this action, but on January 30, 1928, the veto was unanimously disapproved.

On February 14, 1928, Clara W. U. Banta, a daughter of Mr. Urban, who held a power of attorney to act for him, wrote Mr. Hughes, expressing the willingness of Mr. Urban to put his lot in with the rest, but Mr. Hughes never had a valid option on this property. Mr. Urban died on February 23, 1928, and his will was probated on February 29, 1928, and the executors of the will were made parties plaintiff in this action. The executors executed a deed of the property and were willing to deliver it on April 18, 1928.

A different situation exists in regard to the so-called Farrell lot. The option for that lot was executed by Louis P. A. Eberhardt, who claimed to hold a power of attorney from Mr. Farrell, but no proof has been offered to show that Mr. Eberhardt had any authority to sign for Mr. Farrell. Furthermore, it later appeared that the lot in question was owned by a syndicate, and that, before a valid title could be given to the same, an action for partition had to be brought in order to clear up the title. This action was not started until June 21, 1928, and Louis P. A. Eberhardt received a referee's deed for the lot on October 29, 1929. From these facts it will be seen that when the offer was acted upon by the city councils, the plaintiffs were unable to give a valid title to two of the lots.

Concededly the board of education of the city of Buffalo is a separate corporation (Education Law, § 300; *Matter of Fleischmann* v. *Graves*, 235 N. Y. 84), but it has no right to purchase school sites. That power is vested only in the city council. The board may *recommend* one site, or many sites, in a given district, but only the council can *buy*.

Undoubtedly the court has power to decree specific performance if the facts justify it (*Garfein* v. *McInnis*, 248 N. Y. 261), but the court cannot grant such relief unless there is a valid contract between the parties (36 Cyc. 543; *Haber* v. *Seiff*, 248 N. Y. 574; *Harris* v. *Bedell Co.*, Id. 611; *Belbird Realty Corp.* v. *Wolfson*, Id. 615), and the defendants contend that the plaintiffs never had a valid and enforcible contract with defendants.

Section 32 of the Buffalo city charter (Laws of 1914, chap. 217) provides that a resolution for the purchase of the property shall be presented to the council in open meeting; shall be read and spread upon the minutes; shall remain on file with the city clerk for public inspection for at least one week, and be published in an official paper at least three times before the final vote of the council upon its adoption. There is no proof that these provisions were followed — rather the fair inference is that they were not.

Chapter 46 of the City Ordinances, entitled " Lands for Public Purposes," is as follows:

" 1. No lands or real property shall be purchased by the City of Buffalo except in conformity with the provisions of this chapter. In every case where lands or property shall be offered to the City for sale, the true name and post office address of every owner, mortgagee and other person owning an interest in or lien upon said lands or property, accompanied by a written statement giving a description of the same, including its area, its street frontage, its depth, the character, and condition of the improvements on said lands, if any, the then present assessed valuation of said land and improvements, separately stated, the actual value thereof, and the price for which the same may be purchased by the City, shall be disclosed to the Council by a written and verified offer, which shall be printed in the minutes of the Council proceedings before it shall be considered by the Council. If the offer for the sale to the City of any lands or real property is made by a person other than the owner or owners thereof, there shall be included in the foregoing statement required to be made to the Council a further statement of the net amount which the owner or owners are to receive.

" 2. Whenever the Council shall decide or determine to purchase any lands or real property for any municipal purpose, the Commissioner of Finance and Accounts shall cause a notice to be published in the official paper of the City, daily, Sunday and holidays excepted, for ten days, inviting sealed proposals or offers to sell lands or premises to the City as required. Such notice shall define the territory or district within which the lands so required are situated and the minimum area of the lands needed. Every proposal in response to such notice shall contain the information required by Section 1 of this chapter and shall be filed with the Commissioner of Finance and Accounts at his office not later than the hour named by the Commissioner of Finance and Accounts in said notice, which shall be on the day, not a Sunday or holiday, following the last day of publication of said notice, and at which time, all such proposals shall be publicly opened by the Commissioner of Finance and Accounts and the contents thereof made accessible to the public. The Commissioner of Finance and Accounts shall immediately thereafter submit to the Council every such offer or proposal received in accordance with this chapter. This section shall not, however, apply to cases where the City proposes to purchase property adjoining property already owned by the City for the purpose of enlarging the same or adding thereto, or to other cases where the Mayor and Commissioner of Finance

and Accounts shall certify that competition is impracticable and state reasons therefor."

There was not even a substantial observance of this ordinance in offering the property to the city. The failure to comply with the provisions of the charter and city ordinances renders the alleged contract invalid as against public policy. (*Burger* v. *Koelsch*, 77 Hun, 44; *People ex rel. Coughlin* v. *Gleason*, 121 N. Y. 631; *Williams* v. *City of New York*, 118 App. Div. 756.)

The defendants also urge that there was never any valid contract between the parties because the acceptance of the offer was never officially communicated to the plaintiffs by any one with power to bind the city. This position is supported by well-considered legal authorities. (Page Cont. p. 72; Clark New York Law of Cont. § 51, p. 59; *Johnston Heating Co.* v. *Board of Education*, 175 App. Div. 140; affd., 226 N. Y. 592; *Moody Eng. Co., Inc.*, v. *Board of Education*, 205 App. Div. 522; affd., 238 N. Y. 629.)

In my opinion the action of the council on December 31, 1927, never became valid. By the provisions of the city charter it could not be effective until after the lapse of thirty days, and the rescinding action of the new council was within that period. Furthermore, the city could not be bound by a contract which the plaintiffs were at the time unable to perform, and relief must be denied to a plaintiff who is unable to perform his part of the contract. (36 Cyc. 693.)

It is also claimed that the alleged contract is invalid because the offer was first submitted to the board of education instead of to the city council. If an offer is otherwise properly submitted and acted upon, I think it is of little importance how the offer reaches the council for it can take property by condemnation that has not been submitted to it at all.

Is the alleged contract valid under the provisions of section 259 of the Real Property Law, requiring the contract, or some memorandum thereof, to be in writing and signed by the grantor or his authorized agent? Clearly the agent had no valid authority to submit two of the lots, and that was the situation when the new council rescinded the action of the old. This statute is mandatory. (*Dung* v. *Parker*, 52 N. Y. 494.) There could be no meeting of minds under such facts. " The minds of the parties must meet on the very written instrument signed by the seller." (*Hefford* v. *Lichtman*, 116 Misc. 692.) (See, also, *DeGoode* v. *Burton*, 141 App. Div. 22; *Mentz* v. *Newwitter*, 122 N. Y. 491.) This meeting of minds did not take place on December 31, 1927, and no valid contract was made at that time with all the plaintiffs.

The offer stated that the site had 66,000 square feet. In fact

there are only 56,973.9 square feet, about 3,890 square feet of which were owned by the city, but the maps and sketches submitted correctly showed the situation. There was no intentional misrepresentation of the quantity of land and probably no one was really deceived. Some one probably made an error in computing the area of the two irregularly shaped lots, one being the lot owned by the city. If this were the only defense, it could, perhaps, be overlooked.

The defense of laches is important. No time for closing the transaction was fixed in the offer. However, the law will imply that it is to take place within a reasonable time after the formation of the contract. (*N. E. D. Holding Co.* v. *McKinley*, 246 N. Y. 40.) A delay from August fourth to October fifteenth of the same year has been declared unreasonable. (*Savage* v. *Weigel*, 128 Misc. 618.) The fact that the plaintiffs were not able to fully perform the alleged contract until October 29, 1929, is laches that bars a recovery in this action.

Upon the facts and the law the complaint must be dismissed on the merits, but without costs, and findings may be prepared accordingly and judgment entered thereon.